## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VICTORIA H. BOZIC,                    )
                                      )
                    Plaintiff,        )      Civil Action No. 2:11-cv-674
        v.                            )
                                      )      Judge Mark R. Hornak
CITY OF WASHINGTON,                   )
PENNSYLVANIA                          )
                                      )
                    Defendant.        )

## OPINION

**Mark R. Hornak, United States District Judge**

Victoria Bozic was a professional firefighter for the City of Washington ("City"). She was dismissed from that position based on events involved with an investigatory interview meeting convened by the City Solicitor, Lane Turturice, on February 26, 2009. Those two facts appear to be about the only things that the parties and their lawyers agree on.

Now before the Court is Ms. Bozic's Motion for Sanctions, ECF No. 25, in which she asks the Court to remedy a variety of alleged discovery violations by the City.[1] The Court conducted a hearing and argument on the Motion on July 12, 2012, which addressed the majority of the grounds for which Plaintiff sought sanctions. One matter that was not fully addressed or resolved at that hearing was the destruction by Solicitor Turturice (via erasure or "overtaping") of an audiotape of the February 26, 2009 meeting ("Meeting") that he had himself made. Because the matters surrounding that Meeting are central to this case, the Motion for Sanctions takes on special significance.

---

[1] Also pending is Defendant's Motion for a Protective Order, ECF No. 65, which takes aim at correspondence from Plaintiff's counsel, Mr. Archinaco, to Defendant's counsel, Mr. Saul, and which accuses Mr. Saul and the City's insurance carrier of various forms of professional misbehavior. That Motion is also addressed in this Opinion.

The parties have each provided extensive briefing on these issues, complete with multiple affidavits (many from Mr. Turturice) and depositions of a number of key witnesses. *See* ECF Nos. 25; 26; 33; 35; 36; 41; 43; 44; 45; 50; 53; 54; 56; 60; 62; and their respective attached exhibits. The Court conducted a hearing on October 23, 2012 specifically on the destruction of the audiotape, at which time all counsel adduced live testimony and presented additional evidence and argument in support of their respective positions. The Court has considered all of the briefing and accompanying exhibits, the live testimony of the witnesses, and the argument of counsel to the Court. For the reasons that follow, Plaintiff's Motion for Sanctions is granted in part and denied in part. [2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In order to effectively explain the nature of the pending Motion, it is necessary to first describe the basic facts of the case; second, the sequence of events surrounding Mr. Turturice's statements to the Court regarding when and why he destroyed the tape; and third, the

---

[2] Sanctions motions addressing claimed spoliation of evidence are serious business. They will always implicate professional and personal reputations, and are time-consuming and costly to litigate. When proven, the spoliation of evidence can materially affect the disposition of the case on the merits and must be remedied. When it is not, the sting of the allegations remains, along with the lost time and unnecessary expenses attendant to litigating what turns out to have been a costly diversion.

If such motions become part of the routine of litigation (akin to the all-the-more-frequent summary judgment and *Daubert* motions), lawyers may begin to provide legal advice based less on a good faith sense of factual and legal proportionality regarding preservation obligations, and more out of a fear of hefty judicial sanctions if their judgment later turns out to have been incorrect when viewed with the benefit of hindsight. *See generally Electronic Spoliation Sanctions: Delete at Your Own Risk*, Presentation to ABA Labor & Employment Law Section, ERR Committee, Mar. 27, 2010 (David J. Carr ed.). If this comes to pass, no participant in our civil justice system will be well served. *See* Emery G. Lee III, *Motions for Sanctions Based Upon Spoliation Evidence in Civil Cases*, Report to The Judicial Conference Advisory Committee on Civil Rules, Fed. Jud. Center 2011 at 5.

The societal costs of preventative "over-preservation" will be real, to both individuals and organizations, given the degree to which the global inventory of new data and other transmitted and stored information multiplies exponentially on an hourly basis. This is especially so in a world in which the discovery battle *du jour* often involves access to, and preservation of, ubiquitous electronically stored information ("ESI"). *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 78 n.12. (3d Cir. 2012). Organizational litigants will divert resources to "defensive preservation," and individual litigants may be faced with costly spoliation/sanctions battles that they simply do not have the economic resources to fight. Neither state of affairs is a good one. For these reasons, the Court enters the spoliation/sanctions thicket out of necessity, but with great caution.

circumstances of the tape's initial preservation and subsequent erasure. Because the erasure of the tape is the most serious of the actions which Plaintiff has challenged, it is addressed first and apart from the others.

### A. The *Bozic* Case

Sometime in 2007, Ms. Bozic first applied to the City of Washington for employment as a firefighter. Because she believed that she was passed over for such employment because she was pregnant, Ms. Bozic filed a complaint with the Pennsylvania Human Relations Commission (PHRC) and the Equal Employment Opportunity Commission (EEOC) on December 14, 2007. Compl. ¶¶ 21-22, ECF No. 1. Ms. Bozic and the City entered into a settlement agreement on August 12, 2008, and she was hired as a firefighter on September 1, 2008. *Id.* ¶¶ 26, 30.[3] She was terminated from that position on March 5, 2009. *Id.* ¶ 76.

On May 20, 2011, Ms. Bozic brought this suit against the City, alleging unlawful discrimination on the basis of sex, hostile work environment, and unlawful retaliation related to her termination of employment and the sequence of events leading up to it, all allegedly in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq.*, as well as the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq. See generally* Compl. The City countered that Ms. Bozic was fired not because of her gender, nor in order to retaliate against her for prior protected activity, but because she was in violation of the City's requirement that firefighter employees[4] timely reside within the City, and because she lied and submitted to the City false information as to her residency. *See* Ans. ¶ 74, ECF No. 6. A central event in the case is the Meeting that occurred on February 26, 2009 shortly before she was terminated, in

---

[3] It appears that Mr. Turturice played a central role in identifying possible problems with the hiring process at that time, and in working out the settlement agreement.

[4] The record papers reveal that the parties take disparate positions as to the reach of such policy to other positions, either in theory or in fact. The Court need not resolve that dispute at this juncture.

which Mr. Turturice confronted Ms. Bozic regarding her alleged false reporting of her residence, as well as on a number of other alleged work performance issues.

While the parties hotly disagree as to any number of details about that Meeting, they do not seem to dispute the following: the Meeting occurred in Mr. Turturice's private law office and lasted approximately one (1) hour. Compl. & Ans. ¶¶ 43, 49. Also present at the Meeting were (a) Tom Blackhurst, a City councilman, (b) Joseph Manning, a firefighters' union representative, and (c) Lynn Galluze, another City employee. *Id.* ¶ 43; Bozic Aff. ¶ 24 Aug. 6, 2012, ECF No. 45 Ex. 6. Ms. Bozic was questioned about her residency, *id.* ¶ 46, and in response, she provided a Pennsylvania driver's license she had obtained the day before which falsely listed a friend's address within the City as her own, *id.* ¶¶ 20, 45-46, and orally provided an elaborate and prolix false story about improvements to her residence and other details of her and her child's move into it, which would have appeared to make her representations about her residence all the more credible. *Id.* ¶ 61; Bozic Dep. 48-54, Mar. 29, 2012, ECF No. 33 Ex. 1. The Meeting was recorded by an audiotape recorder (a handheld office dictation recorder) that Mr. Turturice placed on the table at the beginning of the Meeting at Manning's suggestion. ECF No. 45 Ex. 6 ¶ 31; Turturice Aff. ¶ 2, Aug. 23, 2012, ECF No. 56 Ex. 5.

The parties are in disagreement as to at least the following: whether at the Meeting Mr. Turturice spoke in a "loud and gruff voice," "cross-examined" Ms. Bozic and implied that she "was having an affair," Def.'s Sur-Reply Pl.'s Mot. Sanctions and/or Evid. Ruling, ECF No. 60 at 8-9 (quoting Bozic Aff.), whether Ms. Bozic broke down crying at the end of the Meeting and stated "If I had a penis this wouldn't be happening," *id.*, and the extent to which Mr. Turturice questioned or accused Ms. Bozic about a variety of other performance issues, such as whether she exhibited poor upper body strength while using a hydraulic rescue tool in a training exercise,

failed to follow the Fire Department "suit up" policy, did not respond to a dispatch call, did not properly roll a hose, did not perform station duties, and did not properly cut a garage door. Joseph Manning Aff. ¶ 8 Sept. 25, 2012, ECF No. 60 Ex. 4; Bozic Aff. ¶¶ 68-93, ECF No. 45 Ex. 6. Plaintiff alleges that the Meeting itself constituted an "adverse employment action," that it was evidence of Defendant's unlawful discrimination against the Plaintiff, and that it demonstrated the fabrication of the negative performance review against her.  Br. Resp. Court's Order Dated July 30, 2012, ECF No. 45, at 17-18.

Immediately following the Meeting, Councilman Blackhurst suspended Ms. Bozic, and on the next day City Council conducted a hearing at which it voted to continue her suspension without pay. Hr'g Officer's Adjudication, Findings of Fact & Conclusions of Law, Def.'s Resp. Pl.'s Mot. Sanctions, ECF No. 33 Ex. 13; Letter from Turturice to Bozic Mar. 4, 2009, ECF No. 33 Ex. 12, at 1-2. On March 5, 2009 a hearing was held on Ms. Bozic's termination, at which she admitted that she had been lying in her residency paperwork and in the Meeting. *Id.* at 5-6. The City Council, purportedly on the basis of Ms. Bozic's falsifications at and outside of the Meeting, ruled that she be terminated from service. *Id.* at 6-9.

In the months after the termination, Ms. Bozic filed for state unemployment compensation ("UC") benefits, which were denied. Ms. Bozic appealed this decision to a UC Referee, who conducted a hearing on August 31, 2009. *See* Pl.'s Timeline Relating to Destruction of Tape, ECF No. 56 Ex. 2; Turturice Dep. 126, Aug. 29, 2012, ECF No. 56 Ex. 10. At that hearing, Mr. Turturice made statements acknowledging that Ms. Bozic might be challenging the City's action as "disparate treatment" and "retaliatory." ECF No. 56-10 at 128-29.   The UC Referee affirmed the local office decision denying Ms. Bozic benefits. *See* Unemployment Compensation Board of Review Decision Aug. 6, 2010, ECF No. 33 Ex. 14.

Ms. Bozic then appealed that determination of the UC Referee to the State Unemployment Compensation Board of Review, which remanded the case to the UC Referee for consideration of whether Ms. Bozic suffered disparate treatment in her termination. *Id*; ECF No. 56 Ex. 10 at 128-29. The remand hearing occurred on March 17, 2010, and a final decision was rendered by the Board of Review on August 6, 2010. *Id.*; ECF No. 56 Ex. 2; ECF No. 33 Ex. 14.

Additionally, Ms. Bozic filed an "Intake Questionnaire" with the EEOC on September 16, 2009, alleging unlawful discrimination on the basis of sex and retaliation for prior protected activity. Intake Questionnaire, ECF No. 56 Ex. 12.   According to Plaintiff's counsel, an employee of the Pittsburgh EEOC, Susan Kelly, later informed him that on December 2, 2009, the EEOC provided notice of that questionnaire to the City and to Mr. Turturice. Decl. Jason Archinaco, Esq. 1, Sept. 31, 2012, ECF No. 56 Ex. 13. On June 7, 2010, Ms. Bozic filed a Charge of Discrimination with the EEOC, and notice of the Charge was provided to the City and to Mr. Turturice shortly thereafter. *See* ECF No. 56 Ex. 2; ECF No. 56 Ex. 10 at 131.

### B. Investigation into the Tape

It appears that no inquiry was ever made as to the existence and status of Mr. Turturice's tape recording of the Meeting until March 19, 2012, when Mr. Turturice was first deposed in this litigation. At that deposition, Mr. Turturice stated "I think I destroyed [the tape]," and stated that he waited "at least 30 days" after Ms. Bozic's termination before he destroyed the tape, the period in which she could appeal the termination under the Pennsylvania Agency Law. 2 Pa. Cons. Stat. Ann. § 752 (West 2012); 42 Pa. Cons. Stat. Ann. § 5571(b) (West 2012). "There being no appeal . . . it was destroyed". Turturice Dep. 11, Mar. 19, 2012, ECF No. 26 Ex. 20. The 30-day period would have elapsed on April 6, 2009. He also stated later in that same deposition that "when we did terminate [Ms. Bozic], we figured we would get sued." *Id.* at 88.

6

This testimony would be the first of several sworn statements in which Mr. Turturice, in response to allegations that he destroyed evidence relevant to reasonably foreseeable litigation, attempted to explain the timing and circumstances surrounding the destruction of the tape, and which has now been the subject of extensive legal briefing leading up to the hearing on October 23, 2012. Because a critical factor in the consideration of the Motion for Sanctions is the timing of the tape's erasure relative to whether and when litigation was reasonably foreseeable, an understanding of the following chronology is important:

- 3/19/12:[5] Mr. Turturice in his First Deposition states that he "destroyed" the tape sometime "at least 30 days" after Ms. Bozic was terminated. ECF No. 56 Ex. 1 at 11. This would put the erasure as occurring after April 6, 2009.

- 5/15/12: Plaintiff's Motion for Sanctions accuses Defendant of discovery violations, *inter alia*, for the destruction of the tape within a time period in which Mr. Turturice should have known Ms. Bozic would sue the City, and thus had a duty to preserve it. ECF No. 26 at 9.

- 7/10/12: Mr. Turturice's First Affidavit states that the tape was destroyed "[a]t some point after the time period elapsed in which Ms. Bozic could have appealed the Hearing Officer's March 6, 2009 Adjudication . . . This was at least a year before the City was aware that Ms. Bozic filed a Charge of Discrimination and over two years before the Complaint was filed." ECF No. 56 Ex. 3. ¶ 12. The EEOC Notice of Charge of Discrimination was issued in June 2010, and the Complaint was filed on May 20, 2011, so this would put the destruction around June 2009 or earlier.

- 7/12/12: At oral argument, the Court questions Mr. Turturice (who is present at counsel table) as to whether it was really plausible that he would not have thought there was a threat of Title VII litigation from Ms. Bozic after the 30 day Local Agency appeal period, or even after the 300 day EEOC Charge filing period had elapsed, given her claim of unlawful discrimination in 2007, and given Mr. Turturice's personal involvement in the resolution of that claim at that time. Defendant's counsel stated in response that the destruction happened after the "300 days in which to file a charge of discrimination [under Title VII]," (i.e. after December 2009) and Mr. Turturice stated although he wasn't exactly sure if he destroyed the tape before or after the 300 days had passed, "[i]t was well, well into the future, Your Honor. We had been through several stages, unemployment compensation, where we won every step of the way . . . we felt it was over at that

---

[5] In this chronology, each date preceding a colon represents the date on which the deposition, affidavit, or proceeding occurred.

point." Hr'g Tr. 30, July 12, 2012, ECF No. 56 Ex. 4 ("7/12 Hr'g Tr."). The second unemployment compensation hearing had occurred on March 17, 2010, and the final unemployment decision was not rendered until August 6, 2010. Thus, if this statement was accurate, it would have placed the destruction after December 2009 (the end of the 300-day EEOC Charge filing period), or perhaps even after March 2010, but before June 2010, when Defendant received the Notice of the EEOC Charge.

- 8/23/12: Mr. Turturice's Second Affidavit states that he did not recall the exact date he taped over the recording, but "[a]t the time I did so, I believed that there was no longer any threat of suit by Ms. Bozic." Turturice Aff. ¶ 5, Aug. 23, 2012, ECF No. 56 Ex. 5. He placed the destruction after the initial 30 days had elapsed (April 6, 2009), but before the EEOC notice was received (June 2010), but did not attempt to estimate any more specifically than that.

- 8/29/12: Mr. Turturice in his Second Deposition states that the period in which he did not believe that there was a threat of litigation, and in which he destroyed the tape, was roughly between March 17, 2010 (after the second unemployment compensation hearing had been conducted but before the final decision was rendered) and June 2010, when he received the EEOC Notice. Turturice Dep. 124, Aug. 29, 2012, ECF No. 56 Ex. 10 ("A: [B]ut it was at some point not long after the last unemployment compensation hearing that we had that I had a comfort level that I felt that there would be no further litigation coming from Ms. Bozic."), *id.* at 132 (Q: "Sometime after the remand hearing occurred, but before you received the June 2010 Charge of Discrimination, in that time frame is when you did not believe there was a threat of litigation? A: Some point in that time frame, yes.").

At that deposition, Plaintiff's counsel confronted Mr. Turturice with an email Mr. Turturice had sent to a co-worker on May 13, 2010, in which Mr. Turturice stated "if Bozic brings another lawsuit, the residency issue is still going to cause the City problems." *Id.* at 132-33; E-mail from Mr. Turturice to Manning May 13, 2010, ECF No. 56 Ex. 11. Mr. Turturice was not asked for, nor did he offer, an explanation for the discrepancy this created with his testimony just prior, by demonstrating that he did in fact anticipate further Bozic litigation between March and June 2010. *See id.*

- 9/4/12: Plaintiff's brief for the first time describes a conversation between Plaintiff's counsel and an EEOC employee Susan Kelly, in which Ms. Kelly allegedly stated that Defendant received written notice on December 2, 2009 of the "Intake Questionnaire" Ms. Bozic had filed with the EEOC. ECF No. 56 at 8; Archinaco Aff., ECF No. 56 Ex. 13. This would have put Defendant on notice of an actual claim far before the previously identified June 2010 date.

- 9/25/12: Mr. Turturice's Third Affidavit admits that he "erred in [his] attempts to give an estimate of when [he] dictated over the recording." ECF No. 60 Ex. 1 ¶ 2.

He states that he does not know when between the 30 days after Ms. Bozic's dismissal (April, 2009) and the City's receipt of Notice from the EEOC (June, 2010) that he deleted the tape. He further states that he is not sure whether or not he received an EEOC Notice in December 2009, but "[i]f [he] had received written notification on December 2009 concerning an EEOC Intake Questionnaire filled out by Ms. Bozic, then the moment [he] dictated over the mini-cassette would have occurred before [his] receipt of such notice." *Id.* ¶ 12. He states, "*at the instant* I dictated over the recording to dictate another document I believed *at that moment* that there was no longer any threat of suit." *Id.* ¶ 4 (emphasis added). He avers that he did not destroy the tape "in an effort to conceal the truth or destroy adverse evidence." *Id.* ¶ 15.

- 10/23/12: On the witness stand in open Court, Mr. Turturice is again asked if there was a time period in the Bozic travail in which he did not believe there was a threat of litigation, and again asserts he felt there was not such a risk after the second unemployment hearing had occurred, suggesting again deletion happened after March 2010. Hr'g Tr. 24, 57-58, Oct. 23, 2012, ECF No. 68 ("10/23 Hr'g Tr."). He explains that at the time of the May 13, 2010 email "I was still confident we would prevail", but "when this issue came up [regarding another employee's residency that was the topic of the email] it was like a spike went up," and "aside from the fact that there might be litigation, the unemployment decision hadn't been decided and who knows, at some point she still might file a lawsuit against us." *Id.* at 52-53.

  When Mr. Turturice is asked about the December 2009 notice and any relationship it might have had to the May 2010 email, the following exchange occured, *id.* at 20:

  o "Q. But you agree when you wrote this email, you had a concern about Victoria Bozic bringing a lawsuit?
  o A. Yes. However, that doesn't necessarily mean that at some point prior to this because this email still falls within the same timeframe that I have maintained either 30 days after and prior to receiving the EEOC letter, be it the June letter or the December letter -- well, not the December letter. Again, I don't recall having received that.
  o Q. Mr. Turturice, and I believe you confirmed this earlier, if you had received the December 2009 notice from that date going forward, you would have had a belief there was a threat of litigation, is that fair?
  o A. Absolutely, yes."

### C. Circumstances of the Tape's Preservation and Destruction

At the October 23, 2012 hearing before this Court, Mr. Turturice also explained with more detail the circumstances of the tape's preservation and destruction that he had already

partially described in his serial affidavits. When asked about the circumstances of destruction, he stated that he frequently used the involved mini-cassette recorder for general law office dictation. 10/23 Hr'g Tr. 50. After the Meeting on February 26, 2009 was finished, he placed the tape of the Meeting in his desk drawer, and labeled it with a "sticky note" that said "'Bozic meeting' or something of that matter." *Id.* at 49. He kept it in the drawer until at some point when he needed a cassette and he did not have any blank ones handy. *Id.* at 50. According to Mr. Turturice, on a "momentary whim" when he needed to dictate something and he thought there was not a threat of litigation, he removed the "sticky note" from the involved tape, placed it in his recorder, and taped over it. *Id.* at 40, 56. When asked by the Court if he ever later attempted to listen to his office tapes to see if he had completely taped over the Meeting (which had lasted about an hour) with other recordings, or whether parts of it might still be in existence, he stated "no." *Id.* at 57. Mr. Turturice stated on redirect examination, "It was a period of time again when I felt there wasn't a threat of litigation. At that particular moment, I needed that tape and I reached for the tape, thought about it . . . . I just needed a tape, I thought about it and I then I taped over" it. *Id.* at 55.

## II.  DISCUSSION

Plaintiff argues that Mr. Turturice's destruction of the tape amounted to sanctionable spoliation of evidence. The decision to sanction parties rests in the sound discretion of the District Court. *See Dunn v. Mercedes Benz of Ft. Washington, Inc.*, CIV.A. 10-1662, 2012 WL 424984, at *4 (E.D. Pa. Feb. 10, 2012) (citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)). "[F]ederal courts have the inherent power 'to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Scott v. IBM Corp.*, 196 F.R.D. 233, 248, (D.N.J. 2000) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

In determining spoliation sanctions, the Court must follow a two-step approach. First, it must determine whether the conduct at issue constitutes spoliation of evidence. Second, if spoliation has occurred, the Court must determine the appropriate level of sanction to impose. *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 74 n.5. (3d Cir. 2012).

**A. Spoliation**

Spoliation includes "the destruction or significant alteration of evidence, or the failure to preserve [or produce] property for another's use as evidence in pending or reasonably foreseeable litigation." *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (internal quotation omitted). The Third Circuit has recently elaborated on its four-factor test to determine what actions constitute spoliation. "Spoliation occurs where: [1] the evidence was in the party's control; [2] the evidence is relevant to the claims or defenses in the case; [3] there has been actual suppression or withholding of evidence; and [4], the duty to preserve the evidence was reasonably foreseeable to the party." *Bull*, 665 F.3d at 73 (citing *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)). Here, *Brewer* factors (1) and (2) are not in dispute: Mr. Turturice had exclusive control of the tape, which he kept in his desk drawer. The tape's contents are plainly relevant to the instant case, because the Meeting is at the very heart of the dispute over whether Ms. Bozic was fired for lying, or whether she was fired out of disparate treatment because of her gender and/or unlawful retaliation, and because Ms. Bozic alleges that the meeting itself constituted adverse employment action.[6] As was the case in *Bull*, the two remaining spoliation factors merit closer attention. *See* 665 F.3d at 74.

---

[6] While Meeting participants Turturice, Bozic, Blackhurst, and Manning have been deposed, that testimony is not a substitute for the verbatim record that the tape embodied where, as here, the participants are at odds with one another as to the tone of the Meeting, and as to much of its content.

### *1. Reasonably Foreseeable Duty to Preserve*

Whether a duty to preserve evidence is reasonably foreseeable is evaluated objectively. *Bull,* 665 F.3d at 78. "[T]he question of reasonable foreseeability is a 'flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.'" *Id.* at 77-78 (internal quotation omitted). "While a litigant is under no duty to keep or retain every document in its possession, even in advance of litigation, it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation." *Mosaid,* 348 F.Supp. 2d at 336 (internal quotation omitted). In the employment discrimination context, one court has observed, "[c]ommon sense would dictate preserving all helpful documentation when dealing with the discharge of a[n] employee with a litigious history." *Scott,* 196 F.R.D. at 249. Another has stated that a duty to preserve evidence arises "*at the latest,* when [Defendants] were served with [Plaintiff's] PHRC complaint." *Dunn,* 2012 WL 424984, at *5 n.8 (emphasis added).

Even before Ms. Bozic was first hired as a City firefighter in 2007, she had challenged the City's firefighter employment practices as being gender discriminatory before the EEOC and the PHRC.   Her termination hearing occurred on March 5, 2009. Her initial claim for unemployment compensation benefits was denied on April 19, 2009. An unemployment hearing was held on August 31, 2009. Her appeal of that decision was granted on December 29, 2009, and the Unemployment Compensation Board of Review ordered a remand hearing solely on disparate treatment issues. Mr. Turturice admitted that throughout that entire time there was still a threat of suit, because "the litigation was ongoing." 10/23 Hr'g Tr. 21-22; *see* ECF No. 56 Ex. 10 at 125-131.   On March 17, 2010, the unemployment remand hearing occurred, which according to Mr. Turturice is the hearing that went so well that he felt the threat of litigation

dissipated. *See id.* at 131; ECF No. 56 Ex. 2. Mr. Turturice also testified without equivocation that when Ms. Bozic was fired, he was confident she would file suit, presumably this Title VII lawsuit. Turturice Dep. 88:21-24, Mar. 19, 2012, ECF No. 56 Ex. 1.

This only leaves between March 17 (the date of the UC remand hearing) and mid-June of 2010 (when Defendant admittedly received Notice of the EEOC charge) as the period of time in which, according to Mr. Turturice, litigation was not foreseeable. Even when considered subjectively, this assertion does not appear to be accurate. His May 13, 2010 email plainly indicates that Mr. Turturice in his own words actually anticipated this civil litigation from Ms. Bozic in the intervening time. *See* Turturice Email, ECF No. 56 Ex. 11. Second, notwithstanding Mr. Turturice's subjective belief as to the dissipation of the threat of litigation during that period, such belief would not have been objectively reasonable. Though the second unemployment *hearing* had occurred on March 17, 2010 a final decision had not yet been handed down – that did not occur until August 6, 2010.

Given the fact that there was ongoing litigation by Ms. Bozic regarding her termination, and specifically on the matter of whether she was disparately treated by the City of Washington, and given the fact that she had already brought a Title VII Charge against the City to the EEOC once before in which Mr. Turturice had been personally involved, any subjective belief Mr. Turturice might have had about any threat of litigation being no longer present because the Local Agency Law appeal period had passed was unreasonable. Whichever way Mr. Turturice tries to cut it, there is simply no period of time after Ms. Bozic's termination, and before the June 2010 Notice of her EEOC charge that began the instant case, in which a threat of litigation from her

was not objectively foreseeable.  Moreover, the evidence overwhelmingly indicates that this litigation was *actually foreseen* by Mr. Turturice.[7]

No matter the intricacies of the twists and turns of his explanations and recollections as detailed above, Mr. Turturice should have known (and in fact did know) that litigation, as to which the tape recording of the Meeting would be important, was likely from the moment of Ms. Bozic's dismissal until this suit was filed.  Thus, the third *Brewer* spoliation factor is present here.

### 2.  *Actual Suppression*

After the Third Circuit promulgated the four-part *Brewer* test in 1995, it did not thereafter describe what actions rise to the level of "actual suppression" (factor 4) until its *Bull* opinion in early 2012. *See Brewer*, 72 F.3d at 334; *Bull*, 665 F.3d at 79; *see also Mosaid*, 348 F. Supp. 2d at 337-38 (collecting cases after *Brewer* and concluding that "actual suppression" permitted a "flexible approach" that included even negligent destruction of relevant evidence). In *Bull*, the court explained:

> In *Brewer* we discussed the connection between a finding of sanctionable spoliation and a ruling on bad faith, stating the following:
>
>> "For the [spoliation] rule to apply . . . it must appear that there has been an actual suppression or withholding of the evidence. *No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for. See generally* 31A C.J.S. Evidence § 156(2); 29 Am.Jur.2d Evidence § 177 ('Such a presumption or inference arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates fraud and a desire to

---

[7] The Court does not accept Mr. Turturice's suggestion that even if litigation might have been generally foreseeable during an overall period of time, there were intervening intermittent "moments" or "instants" in which this litigation was not foreseeable, obviating any preservation duty. *See* Turturice Aff. 9/25/12 ¶ 2, ECF No. 60 Ex. 1; 7/23 Hr'g Tr. 52-53. Objectively, on this record, these events did not spontaneously shift the likelihood of litigation from foreseeable to unforeseeable, blinking on and off "like a light bulb not screwed tight." *See United States v. MacDonald,* 632 F.2d 258, 265 (4th Cir. 1980), *rev'd on other grounds,* 456 U.S. 1 (1982).

suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.').”

*Brewer*, 72 F.3d at 334 (emphasis added). *Therefore, a finding of bad faith is pivotal to a spoliation determination.* This only makes sense, since spoliation of documents that are merely withheld, but not destroyed, requires evidence that the documents are actually withheld, rather than—for instance—misplaced. Withholding requires intent.

665 F.3d at 79 (emphasis added) (citing *Brewer*, 72 F.3d at 334). The *Bull* court held that the

District Court "abused its discretion in determining that Bull intentionally withheld the[ original]

documents," *id.* at 79, that had been requested during discovery, and instead described the failure

to produce documents as consistent with a presumption of "inadvertence," *id.* at 77.

What remains to be determined after *Bull* is the requisite mental state or level of scienter

for *Bull* "bad faith," i.e., whether the movant must demonstrate that the sanctioned party acted

with the *specific intent* of hiding adverse information from a tribunal or from a litigation

opponent, or whether other types of actions that are intentional in form, yet only highly reckless

as to their consequences relative to evidence, also rise to that bad faith level.  On the one hand,

the *Bull* opinion placed heavy weight on the *intentionality* of the conduct. *Id.* at 79

("Withholding requires intent."). This could be read to require only a more general "intent to

act." However, the internal quote might also suggest a higher and more specific standard of

scienter: "fraud and a desire to suppress the truth." *Id.*

This question goes to the heart of the matter.  *Bull* states firmly that destruction that

occurs as a result of inadvertence, routine practice, or accident is not spoliation at all. 655 F.3d at

79. Centering on the facts there present (the withholding of the originals but not copies of

relevant documents from the defendant UPS), the *Bull* court also required evidence that the

plaintiff "intended to actually withhold the original documents *from UPS* before we can conclude

that sanctionable spoliation occurred." *Id.* (emphasis added).  This would seem to require not

15

only an intent to destroy or withhold evidence, but also an intent to do so for the specific purpose of denying it to the other party in litigation.

The touchstone of the *Bull* test, however, appears to this Court to be a finding of "bad faith." 665 F.3d at 79. Certainly, such would appear to be present when evidence is withheld or destroyed with the specific intent and purpose of keeping it out of the hands of a litigation adversary. The facts here present the more nuanced question of whether a reckless disregard for the consequences of an intentional and conscious destruction of evidence, previously specially preserved for purposes of subsequent litigation, at a time when litigation is necessarily foreseeable, meets that "bad faith" test. The Court concludes that it does.

The decided cases applying *Bull* have not offered much direct guidance to this point. To date, the Third Circuit has issued three (3) unpublished opinions in *Bull*'s wake. First, that court held that a district court did not abuse its discretion in finding spoliation where the plaintiff, a licensed attorney, destroyed what she "knew . . . would be essential evidence in her lawsuit against [Defendant]. In short, this court can think of no reason that justifies [Plaintiff's] deliberate disposal of the property." *Capogrosso v. 30 River Court E. Urban Renewal Co.*, No. 10-3741, 2012 WL 1704093, at *4 (3d Cir. May 16, 2012), *cert. denied*, 12-255, 2012 WL 4009306 (U.S. Oct. 29, 2012).[8] In the two others, the Third Circuit held that there was no spoliation where "there is no showing that the evidence was destroyed *in order to prevent it from being used* by the adverse party," *United States v. Nelson*, No. 11-3789, 2012 WL 2019166, at *2 (3d Cir. June 6, 2012) (emphasis added), and where there was no evidence that the allegedly destroyed documents ever existed, *Omogbehin v. Cino*, No. 11-2223, 2012 WL 2335319, at *2

---

[8] In *Capogrosso*, there was no finding that the property was disposed of with the specific intent to keep it from a litigation adversary. There was a finding that it was destroyed at a time when it was known that the other party wanted to inspect it. 2012 WL 1704093, at *4.

(3d Cir. June 20, 2012). Thus, as among the non-precedential Third Circuit cases, the record is mixed.

Almost all of the district court cases applying *Bull* of which this Court is aware have declined to find spoliation where the party's conduct was no worse than negligent, or where the evidence was lost in the normal course of daily business or other similar activity. *See, e.g.*, *Harris v. Jacobs*, CIV. A. 11-4685, 2012 WL 4109052, at *14-15 (E.D. Pa. Sept. 19, 2012) (negligence); *Heck v. Mem'l Health Sys.*, 1:10-CV-1675, 2012 WL 3597175, at *2-3 (M.D. Pa. Aug. 20, 2012) ("merely been misplaced"); *Tabon v. Univ. of Pa. Health Sys.*, 10-CV-2781, 2012 WL 2953216, at *4-5 (E.D. Pa. July 20, 2012) (ordinary practice); *Victor v. Lawler*, 3:08-CV-1374, 2012 WL 1642603, at *8-10 (M.D. Pa. May 10, 2012) (loss in ordinary course; efforts taken to preserve, but were not successful); *Dunn v. Mercedes Benz of Ft. Washington, Inc.*, CIV.A. 10-1662, 2012 WL 424984, at *6 (E.D. Pa. Feb. 10, 2012) (conduct "at the very least, negligent," but no evidence of destruction "willfully or in bad faith"). *But see Klett v. Green*, 3:10-CV-02091, 2012 WL 2476368, at *11 (D.N.J. June 27, 2012) (finding spoliation though Plaintiff's conduct was only negligent). Thus, these cases are more illustrative of what actions do not constitute *Bull* bad faith than of what actions do.

The conduct displayed by Mr. Turturice here, considered as a whole, rises well above inadvertence, negligence, inexplicable foolishness, or part of the normal activities of business or daily living, any of which arguably fall outside of the spoliation definition set forth in *Bull*. Mr. Turturice admits to intentionally and consciously preserving the tape because of at least one type of anticipated litigation, assuming that Ms. Bozic would sue the City, and then admits to intentionally and consciously destroying the tape knowing what it was – he "thought about it,"

17

removed the "sticky note" labeled "Bozic," and recorded over the only concrete evidence of what actually transpired in the February 26, 2009 Meeting.

His explanation is that he did this at a fleeting moment in time when he did not believe there was an actual threat of litigation, although after numerous inconsistent attempts, he has given up on pinpointing when such a threat–free interval occurred. Even in the Court proceeding on October 23, 2012, after his latest Affidavit had stated that he knew only that the destruction occurred between April 2009 and June 2010, Mr. Turturice affirmed the March 2010 to June 2010 window as the timeframe for the destruction (though that assertion is already severely undercut by his statements regarding residency-related litigation by Ms. Bozic in his May 13, 2010 email). But he has also consistently maintained that he does not know whether he received notice from the EEOC in December 2009, *but if he did*, he would have destroyed the tape before then. ECF No. 60-1 ¶ 12.

The fact that Mr. Turturice cannot commit to having received or not having received the December 2009 EEOC notice at least suggests the conclusion that Mr. Turturice has recognized that if evidence arises that Notice *was* given back in 2009 (as suggested but not proven by the alleged telephone conversation of Plaintiff's counsel with the EEOC official), he would not have entirely painted himself in a corner by firmly sticking to his March to June 2010 timeframe. But still he proffers that that timeframe was the time in which he thought there was no longer a threat of litigation, and thus when the tape's destruction must have occurred. *See* 10/23 Hr'g Tr. 57-58; Turturice Dep. 8/29/12, ECF No. 56 Ex. 10, at 131-132. He cannot have it both ways. The Court declines this invitation to reverse engineer the destruction timeline to divine the most innocent

time for Mr. Turturice to have destroyed the tape, and then assume that that indeed was when the destruction occurred.[9]

Given Mr. Turturice's knowledge of Ms. Bozic's 2007 gender discrimination claim, his involvement in its litigation and resolution, his recognition immediately after Ms. Bozic's dismissal that she would file suit against the City, the extensive and lengthy unemployment compensation litigation, his recognition in the May 2010 email that issues involving Ms. Bozic's residency were far from over, and the rambling and internally conflicted state of his testimony, the only plausible conclusion that can be drawn from Mr. Turturice's changing story is that he preserved the tape for litigation purposes, then intentionally destroyed it at a time when litigation was reasonably foreseeable, and at the very least, that he was reckless as to the consequence of that action on any future litigation involving Ms. Bozic.  The Court believes that on these facts, the *Bull* "bad faith" standard has been met.

While the Court does not conclude that Mr. Turturice destroyed the tape with the specific malicious intent of keeping the record of the Meeting from Ms. Bozic or from the Court, his conduct runs counter to a wholly innocent explanation. This is particularly so in that he had specifically preserved and labeled it, outside of the normal course of his business activities, because of his anticipation that it might be relevant to subsequent litigation. Mr. Turturice's shifting testimonial accounts as new evidence regarding the destruction emerged, over three affidavits, two depositions, and two in-court representations – a total of seven statements – further amplifies this point. While it is unclear where the exact line of "bad faith" under *Bull* lies,

---

[9] Mr. Turturice, and Defendant's counsel, argue that given what they describe as Ms. Bozic's "egregious lies" at the Meeting, ECF No. 33 at 2, the City had no motive to erase the tape, since it would help it to prove those lies. Perhaps so. It is also possible that City representatives concluded that the loss of the recorded proof of her now-admitted lies was a price worth paying, if the tape also contained evidence, in content and tone, of more ominous conduct by City representatives. The problem is, now we will never know.

the Court concludes that destroying the tape, after specifically preserving it for litigation purposes, knowing that it was the Bozic Meeting tape, and while anticipating this very litigation, goes well past any such line and fulfills the "bad faith" standard announced in *Bull*.[10]

**B. Sanctions**

Having determined that spoliation has occurred, the Court must now determine what remedy is appropriate. Here, the test is to consider "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Bull*, 665 F.3d at 74 n.5 (citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)).[11] As for the first factor, the Court has already found that Mr. Turturice's conduct was indeed culpable. It involved the intentional destruction of core, relevant evidence with a reckless disregard for its importance to this litigation.

The Court believes that the "bad faith" scienter requirement of *Bull* also requires a parallel consideration of culpability in determining the scope and severity of the sanction to be imposed. First, the equitable nature of the three-factor balancing test for sanctions set forth by the Third Circuit in *Schmid*, 13 F.3d at 78, and reaffirmed in *Bull*, 665 F.3d at 74 n.5, seems to presuppose different remedies crafted for different levels of misconduct. *See Dunn*, 2012 WL

---

[10] This determination is in conformity with the Third Circuit's holding in *Capogrosso*: a party that is himself an attorney, who knew litigation was foreseeable and had "no reason that justifie[d]" his "deliberate disposal of" evidence that was central to the case, committed spoliation of evidence. *See* 2012 WL 1704093, at *4. The sanction imposed on the City is not based on Mr. Turturice's professional standing or conduct as a lawyer, although such status makes his actions and explanations all the more puzzling. He acted as an official representative of the City, and that standing is the basis of this decision.

[11] In many ways, the use of the term "sanctions" is a misnomer, as that term might suggest that the principal goal of a Court's Order in these circumstances is to punish the participants. From the Court's perspective, the more accurate term would be "remedy," as the principal goal of judicial action here is to restore the playing field to where it had been from an evidentiary and proof standpoint.

424984, at *7 n.10 (noting that while the Court found no bad faith and thus found the spoliation sanction of partial summary judgment inappropriate, because the movant "has not requested any other spoliation sanctions," the Court did "not determine whether other sanctions may be appropriate."). Second, district courts have long been instructed to take a flexible approach in crafting sanctions that are proportionate to the conduct at issue. *See Republic of Phillippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 74 (3d Cir. 1994) (citing *Chambers,* 501 U.S. at 44). Third, the court in *Bull,* after finding that there was not sufficient evidence of spoliation to justify dismissal of the case, nonetheless went on to consider the *Poulis v. State Farm Fire & Cas. Co.,* 747 F.2d 863, 867 (3d Cir. 1984) factors for sanctions.[12] In so doing, it suggested that an adverse inference might have been an available sanction in that case: "we fail to see how an adverse inference – though itself a severe sanction – would not have been preferable to a dismissal with prejudice. . . . sanctions other than dismissal with prejudice were available to adequately address any impacts suffered." *Bull,* 665 F.3d at 82. This Court concludes that a spoliation sanction is not "one size fits all," but must be tailored to fit the facts of the case. Regardless of the level of culpability that must be present to justify the remedy of dismissal with prejudice, the level sufficient to justify a remedial sanction short of that is plainly present here.

As for the second *Bull* sanction factor, it is highly likely that Ms. Bozic is materially prejudiced by the absence of the Meeting tape (as is the truth-seeking process). As noted above, five (5) people were present in the Meeting, and all of them are employees (or Council Members) of the City except for Ms. Bozic. The tape would have certainly put to rest whether the Meeting contained evidence of the City's or Mr. Turturice's allegedly especially harsh

---

[12] Those factors are: "(1) the party's personal responsibility; (2) the prejudice to the adversary; (3) a history of dilatoriness; (4) willfulness or bad faith; (5) the availability of alternative sanctions; and (6) the merit of the claim or defense." *Bull,* 665 F.3d at 80 (citing *Poulis,* 747 F.2d at 867).

treatment of Ms. Bozic, especially with regard to the other charges levied against her for poor work performance. Additionally, the fact that Ms. Bozic alleges that this Meeting itself constituted an adverse employment action further puts the Meeting at the center of the case.

As to the third *Bull* factor, the Court concludes that no lesser sanction than at least a spoliation adverse inference would avoid substantial unfairness. When confronted with spoliation, District Courts have the discretion to impose (1) dismissal of a claim or granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference, referred to as the spoliation inference; (4) fines; and (5) attorneys' fees and costs. *Mosaid*, 348 F. Supp. 2d at 335. The "spoliation inference" permits the fact-finder to infer that the destroyed evidence would have been unfavorable to the position of the offending party. *Schmid*, 13 F.3d at 78; *Brewer*, 72 F.3d at 334. Plaintiff has requested as sanctions the striking of Defendant's Answer and all defenses, suppression of all evidence relating to the Meeting, and at a minimum, a spoliation inference and monetary fees. ECF Nos. 25, 43 at 12.

The Third Circuit, quoting then-Judge Breyer's characterizations on the spoliation inference, has explained that:

> [T]he evidentiary rationale for the spoliation inference is nothing more than the common sense observation that a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence than is a party in the same position who does not destroy the document. . . . the spoliation inference is also seen as having prophylactic and punitive effects.

*Id.* (quoting *Nation-wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1st Cir. 1982)) (internal marks omitted). Put in other words, "the spoliation inference serves a remedial function – leveling the playing field after a party has destroyed or withheld relevant evidence." *Mosaid*, 348 F. Supp. 2d at 338.

While the Third Circuit characterized the spoliation inference as "itself a severe sanction," *Bull*, 665 F.3d at 82, it has also noted that outright dismissal or suppression of evidence are "far more serious" sanctions than the inference. *Schmid*, 13 F.3d at 79. Other District Courts have characterized the spoliation inference as a "more common penalty." *Mosaid*, 348 F. Supp. 2d at 335. The reason for this is that a spoliation inference is generally only a permissive one, which allows, but does not require, the jury to arrive at its own conclusion about the content of the missing evidence based on the facts before them. *See Kounelis v. Sherrer*, 529 F. Supp. 2d 503 (D.N.J. 2008). Nor does it prevent a party from producing evidence at trial to counter that inference. *Id.*

This Court agrees that the spoliation inference is an appropriate remedy here,[13] but one which must be tailored to the particular facts of this case.[14] The inference will help to remedy the prejudice imposed on Ms. Bozic and the process of adjudication of this case by the senseless destruction of the tape.   At the same time, it does not prevent the City from adducing any evidence from its witnesses as to the contents of the Meeting, or as Mr. Turturice's account of his destruction of the tape. There is also no lesser evidentiary sanction that could be imposed that would help to remedy the prejudice to Ms. Bozic.

In the Court's judgment, a remedy consisting only of a permissive inference does not fully "fit" the peculiar facts of this case in terms of restoring the evidentiary playing field to its

---

[13] Indeed, Defendant's counsel at the October 23, 2012 hearing "submit[ted]" that a spoliation inference would be "a fair remedy in this situation." 10/23 Hr'g Tr. at 88:9-10.

[14] Why not a more severe and preclusive sanction as is requested by Plaintiff?  Because (1) all of the participants in the Meeting (other than Ms. Galluze) have been deposed; (2) Ms. Bozic does not dispute (but does seek to explain) her false residency claims made at the Meeting; and (3) all of that testimony will be available for inclusion in the summary judgment (and trial) record, the Court concludes that imposing a dismissal or evidence suppression sanction would be unnecessary overkill.  The Court concludes that the remedy provided here is "precisely tailored" for the harm caused by the conduct present in this case, and fits the "necessities of [this] particular case." *See Swann v. Charlotte-Mecklenburg Board of Educ.*, 402 U.S. 1, 15 (1970).

pre-destruction status. To do that, the Court believes that the inference must be enhanced by including a directive from the Court to the fact-finder that Mr. Turturice was charged with having anticipated this litigation, and that as a representative of the City he had a duty to preserve the tape. The need for this enhancement is based on both the principles stated in *Bull*, and on common sense – a rational jury does not need an instruction to know that it *may* conclude that the facts of destruction presented here were premised on a concern of Mr. Turturice about the tape's content. Only by giving this enhanced instruction can the jury understand the preservation duties that Mr. Turturice had, and the context of that duty. Thus, this Court will instruct the jury at trial[15] that it may conclude that such evidence was destroyed because its contents were harmful to Defendant.

Additionally, the Court finds that a focused monetary remedy is also necessary in this case in order to properly allocate the litigation costs resulting from the tape's destruction. Because of the wasted time and energy necessarily consumed in Plaintiff's dealing with the twists and turns of Mr. Turturice's explanations, Defendant shall be obligated to reimburse the Plaintiff for the transcript/reporter costs of Mr. Turturice's second deposition on August 29, 2012 (because such deposition was only necessitated to examine Mr. Turturice's actions) along with the Plaintiff's counsel's actual fees incurred in the preparation and conduct of such deposition at Plaintiff's counsel's regular hourly rate, not to exceed a total of ten (10) hours. Plaintiff's counsel shall file and serve a statement of such amounts within ten (10) days of the date of this Opinion and Order, and they shall be paid by Defendant within ten (10) days thereafter.

---

[15] A trial which will occur if Plaintiff withstands the Motion for Summary Judgment that Defendant assures the Court is coming. In considering such a Motion, the Court will give the appropriate consideration to the inference that the jury will be permitted to draw as to the content of the Meeting.

## III. PLAINTIFF'S OTHER SANCTIONS REQUESTS

In her Motion, Plaintiff also seeks sanctions on the grounds of a number of other alleged discovery violations on the part of employees of Defendant and Defendant's counsel claiming that (1) Defendant failed to timely produce documents relating to a potential comparator, Firefighter/EMT Dustin Danley, and falsely stated that it had produced all documents relating to Mr. Danley when it, in fact, had not; (2) Defendant's counsel unilaterally ended a deposition of Fire Captain Blumer when he was in the middle of providing allegedly false testimony that he did not recall the existence of certain documents, of which his knowledge was later proven; and (3) Defendant's counsel falsely informed Plaintiff's counsel that searches for emails had been conducted, when not all of the relevant City representatives' email accounts regarding Mr. Danley had been searched. *See* Pl.'s Mot. Sanctions, ECF No. 25, ¶ 2. The Court has had the benefit of copious briefing on these issues, as well as oral argument on July 12, 2012. Each of these grievances is addressed in turn.

### A. The Danley Documents – Hard Copies

Plaintiff accuses Defendant of not producing a number of documents relating to Dustin Danley, a male firefighter who was disciplined (but not fired) for misrepresenting his status as a certified EMT to the City. While Mr. Turturice, when given Plaintiff's discovery requests, turned over a number of documents from his own file relating to Danley, he failed to deliver a September 2009 Stipulation and Settlement Agreement between Danley and the Pennsylvania Department of Health regarding Danley's "misrepresenting himself" as an active EMT. *See* Pl.'s Br. Support Mot. Sanctions, ECF No. 26, at 4. Plaintiff then obtained those documents pursuant to a subpoena directly from the Pennsylvania Department of Health. *See id.* at 4. Defendant's representatives later acknowledged that a copy of that settlement agreement was also in the files

of the City Fire Department, but that they did not previously know that such records of employees were kept there. *See id.* at 4-5; ECF No. 26 Ex. 8 at 3.   Plaintiff asserts that Mr. Turturice and/or other members of City officialdom intentionally destroyed or withheld those documents; Defendant admits the documents were not delivered, but asserts that the failure to produce them was merely a mistake – moreover, it noted that it had produced a number of other documents relating to Danley's misrepresentations. *See* ECF No. 26 Ex. 8 at 3; Def.'s Resp. Pl.'s Mot. Sanctions, ECF No. 33, at 15-16.

Additionally, Mr. Turturice failed to produce a letter dated June 18, 2009 that he had sent to the State Health Department, which at that time was considering permanently revoking Danley's EMT Certification. *See* Pl.'s Reply Def.'s Resp. Pl.'s Mot. Sanctions, ECF No. 35, at 4. Mr. Turturice explained in the letter that the City was "quite desperate" for Danley to continue to serve as a firefighter, a position he could not serve without the EMT Certification, and requested that a decision regarding him be "fast track[ed]" and resolved in his favor. *See id.*; ECF No. 26 Ex. 21. Mr. Turturice also did not produce this document, which was also discovered via the Department of Health subpoena, and Defendant stated it "simply did not turn up in Mr. Turturice's search of his files." ECF No. 33 at 19.[16]

At the July 12, 2012 hearing, the Court observed without contradiction from any counsel that all documents believed to be missing were at that point in the hands of Plaintiff. 7/12 Hr'g Tr. at 3-4, 10. It noted that, if any further depositions were to be conducted on the matter of these documents relating to Danley, it would be Plaintiff's prerogative to seek such further depositions, and the actual transcript/reporter costs of them would be borne by Defendant. *Id.* at

---

[16] Throughout these proceedings, a number of the discovery-related actions of the Defendant, and of Mr. Turturice, have appeared dismissive of the potential validity of Ms. Bozic's claims, resulting in what appears to be a somewhat cavalier approach to Defendant's obligations to provide complete discovery responses from the start.  Whether that belief as to the validity of Ms. Bozic's claims turns out to have been correct will be determined when the merits of this action are addressed.

40-41. Additionally, the Court allowed the parties to arrange a search of Mr. Turturice's computer to see if any electronic documents relating to Danley could be recovered. *Id.* at 42, 49-52. The Court has received no filings that indicate that that search, if it occurred, has yielded any further evidence of relevance to these matters.

## B. The Blumer Deposition

Plaintiff also levies accusations relating to the deposition of Nicklous Blumer, a Captain and EMS Coordinator for the City Fire Department. At the time of Captain Blumer's deposition on May 10, 2012, Plaintiff had been in possession of the September 2009 EMT Agreement for about fifteen days (having been provided it by the Pennsylvania Health Department), of which Captain Blumer had once received four copies. *See* ECF No. 33 at 9-10. When Captain Blumer was confronted with the Agreement at his deposition and asked a series of questions about his knowledge of it, the deposition grew hostile. *See* ECF No. 26 at 7-8; ECF No. 33 at 10-13; Blumer Dep. 24-33, May 10, 2012, ECF No. 26 Ex. 15. When Captain Blumer was unable to describe whether he recalled the Agreement's existence, what Defendant characterizes as "badger[ing] the witness," ECF No. 33 at 13, and an "ambush," 7/12 Hr'g Tr. 34:21, 35:2, transpired. Plaintiff's counsel describes Captain Blumer's reaction as proving conclusively that Captain Blumer was caught in "his lie" regarding denial of knowledge of the letter's existence. ECF No. 35 at 9. The following exchange occurred between counsel:

> MR. BRACKEN: I am not under oath, sir. You guys concealed evidence form me in this case, because Dustin Danley lied to the City of Washington. You did it. I got documents from a third party. You hid them. Now you're caught. And we are going to go through everything.
>
> Mr. SAUL: That is totally incorrect. We are not hiding anything. This deposition is over right now. You are the one that is hiding documents from me.

27

ECF No. 26 Ex. 15 at 29:7-17. Defendant's counsel ended the deposition shortly thereafter by walking out. At the July 12, 2012 hearing, the Court gave Plaintiff the prerogative to re-depose Captain Blumer (and other City representatives) regarding the September 2009 letter if she wanted to do so, with the City paying the transcript/reporter costs. 7/12 Hr'g Tr. at 39.

### C. Emails Relating to Danley

Plaintiff has also accused Defendant of failing to conduct a proper search of Captain Blumer's emails relating to Danley. *See* ECF No. 33 at 17. Plaintiff's counsel also accused Defendant's counsel of misrepresenting that all relevant email accounts had been searched, when Captain Blumer's (and a few other employees') *personal* email accounts had not yet been searched. *See id.* Defendant's counsel in response stated that this was an inadvertent mistake on his part, because Mr. Turturice had told the City's IT person to conduct certain searches, but not searches of personal email accounts. *See id.*; Def.'s Sur-Reply re: Pl.'s Mot. Sanctions, ECF No. 36, at 8, Ex. 2, 3. These personal accounts were searched in May and June 2012, and documents were retrieved from them and produced to Plaintiff. *See id.* At the July 12, 2012 hearing, the Court observed without contradiction from any counsel that all emails believed to be missing were also at that point in the hands of Plaintiff. 7/12 Hr'g Tr at 5.

### D. Remedy

While the parties vehemently debate the "smoking gun" nature *vel non* of the Danley/EMT documents whose production was delayed, the Court finds the failure to produce the documents is susceptible to both innocent-yet-clumsy, and more sinister, explanations.[17] The

---

[17] The Court finds no merit in Defendant's repeated assertions that it could have had no reason to suppress documents relating to Danley because Danley was not "a proper comparator" to Ms. Bozic, and thus any documents relating to his censure are irrelevant. *See* ECF No. 36 at 2-6. Defendant argues, as its primary support for this assertion, that the law draws a distinct and inviolate line between probationary and non-probationary employees, who cannot be considered comparators of one another. First, it is debatable whether even on the facts Ms. Bozic was probationary and Danley was not. *See* ECF No. 35 at 4-5. Second, this assertion misstates the law: whether an employee is 'similarly situated' is a multi-factor balancing test and not a bright-line rule. *See Wilcher v. Postmaster*

Court notes in particular that Defendant did initially deliver to Plaintiff a number of documents relating to Danley in response to Plaintiff's discovery requests, and its representatives were forthcoming in their depositions regarding the circumstances surrounding Danley's censure by the State Health Department. There is not at this point record evidence of a grand effort on the part of the City's representatives to suppress all evidence and testimony relating to Danley. Rather, there was a failure to produce certain documents from a file that had been closed for approximately three (3) years. Thus, there is simply insufficient evidence for the Court to conclude that the representatives of the City conspired and took intentional actions to suppress such evidence, rather than that they were merely negligent or inadvertent in their efforts to keep and retrieve detailed files and records relating to City employees.

The Court believes that any prejudice that Plaintiff might have suffered as a result in the delay of production of these documents has now been remedied. Unlike the situation with the tape of the February 26, 2009 Meeting, none of these documents was permanently suppressed, and Plaintiff is now seemingly in possession of all such materials. The Court at the July 12, 2012 hearing also imposed focused remedial measures, permitting Plaintiff to conduct further inquiries into the Defendant's failure to produce these documents through follow-up depositions and searches for electronic documents, all at Defendant's expense. The parties have not since filed any supplemental briefing as to a failure to produce any of the documents other than the

---

*Gen.*, 441 Fed. App'x 879, 882 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1645, 182 (2012) ("A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in."); *Houston v. Easton Area Sch. Dist.*, 355 Fed. App'x 651, 654-55 (3d Cir. 2009) (same). Third, even if Defendant did have a good faith belief in its factual and legal argument that Danley is not a proper Title VII comparator, it is apparent from the record that such a belief would be vigorously contested at the summary judgment and/or trial stage. The fact remains that Danley and Ms. Bozic were both firefighters who made material misrepresentations to the City and whose relationships with the City ended up very differently: Ms. Bozic was fired. Mr. Danley was not. How that plays out at the summary judgment stage (or at trial) is yet to be seen. Nonetheless, the relevance of proffered evidence is to be determined by the Court, and its weight by a jury at trial. Counsel is simply not empowered to make a unilateral legal determination to the contrary at the discovery phase, and then to use it in a self-serving manner to suggest "no harm, no foul." *See* ECF No. 36 at 6.

audiotape. Thus, the Court does not find it necessary to impose further measures beyond those noted above relating to the destruction of the audiotape.

The Court is troubled by the evidence of Defendant's failure to promptly and completely produce documents and other discovery when the case is viewed as a whole. The audiotape and the Danley documents are both important (if not critical) pieces of information in this case that, for some reason or another, went missing either for a while, or forever. Were it not for the Plaintiff's third party subpoena to the Commonwealth, many of them probably would have never been retrieved.

The Court also notes with profound disapproval Defendant's counsel's conduct in unilaterally ending a deposition because he felt "ambushed" by the witness being confronted with documents he had not previously seen. Under Fed. R. Civ. P 30(d)(3), a party may "move to terminate or limit [a deposition] on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. . . . If the objecting deponent or party so moves, the deposition must be suspended for the time necessary to obtain an order." If Defendant's counsel believed the deposition had become so hostile to the witness that it could not and should not continue, the proper remedy was to suspend the deposition and seek an immediate protective order of this Court, rather than to engage in the self-help of simply walking out. The Court concludes that any harm that may have been done to Plaintiff's position was essentially remedied by allowing for the deposition of Mr. Blumer to be re-taken at Defendant's expense. While the Court in no way condones such activity, Defendant's counsel's actions do not support further independent sanctions.

## IV.  DEFENDANT'S MOTION FOR PROTECTIVE ORDER

In its Motion for Protective Order, Defendant seeks the protection of this Court from a barrage of biting correspondence from Plaintiff's counsel, Mr. Archinaco, and one letter in particular dated October 24, 2012. ECF No. 65; *id.* Ex. 3.  That letter belittles, if not mocks, Mr. Turturice for no apparent purpose as to this litigation, and among other things seems to suggest, if not encourage, that Mr. Turturice sue Defendant's counsel.   Since the letter begins by disclaiming that it is intended as an entreaty to now engage in settlement discussions, the Court can divine no litigation purpose whatsoever for the letter.[18]  In spite of the Court's on-the-record admonition to all counsel to behave professionally and for Plaintiff's counsel in particular to stop incessant accusatory and invective-laden emails as the preferred approach to inter-counsel communications, Hr'g Tr. 6, Sept. 5, 2012, ECF No. 65 Ex. 2, and while discerning no justification for the letter which triggered the Motion, the Court does not, on this record, find a case-law or rule-based foundation to sanction unquestionably rude and gratuitous conduct on the part of Plaintiff's counsel as is reflected in that correspondence.  The Defendant's Motion for a Protective Order is therefore denied without prejudice.

Plaintiff's Motion for Sanctions is granted with regards to the audiotape of the February 26, 2009 Meeting as described above, and denied with regard to all other alleged discovery violations on the part of Defendant. Defendant's Motion for Protective Order is denied without prejudice.  An appropriate Order will issue.

---

[18] In his Response, Plaintiff's counsel asserts that this letter was triggered by the City's alleged failure to comply with Court policy and Order regarding participation in the mediation process. *See* ECF No. 66.  If that is true, then the proper course was to take that up with the Court.

Mark R. Hornak
United States District Judge

Dated: December **5**, 2012

cc:     All counsel of record